OPINION OF THE COURT
Chief Judge Wachtler.
This appeal requires us to consider several aspects of New *696 York’s price-gouging statute (General Business Law § 396-r), which prohibits merchants from charging unconscionably excessive prices for essential consumer goods during disruptions in the market caused by such forces as strikes, power failures, weather conditions and other emergencies.
Respondent Two Wheel Corp., through its division, Honda-Yamaha of Mineóla, is a retailer of portable electric generators; respondent Morris Zegarek is president of the corporation. The Attorney-General initiated this proceeding pursuant to the enforcement powers granted by General Business Law § 396-r (4) and Executive Law § 63 (12), alleging that respondents violated the price-gouging prohibition following Hurricane Gloria, which left much of Long Island without electrical power between September 27 and October 8, 1985.
The petition charged that, beginning on September 26, in anticipation of the storm, and continuing through October 5, respondents sold approximately 100 generators at inflated prices ranging from 4% to 67% over the "base prices” for those models.[1] Respondents did not deny either the sales or the price disparities. They argued, however, that generator sales were not governed by the price-gouging statute. In addition, they contended that the price increases were justified by increased freight and labor costs and various business risks associated with the sales, such as the possibility that customers might cancel their orders if power were restored before the generators were delivered, leaving respondents with a large inventory.
Supreme Court denied respondents’ request for a hearing, concluding that no factual issues had been raised, and granted the relief sought in the petition. In pertinent part, respondents were ordered to pay a civil penalty of $5,000, to make restitution to 13 consumers who had submitted affidavits in support of the petition, and to establish a $20,000 restitution fund for other consumers who purchased generators from respondents during the period for any amount exceeding the base price. The Appellate Division affirmed (128 AD2d 507) and we granted leave. We affirm, but for reasons which differ from those given by the trial court and the Appellate Division.
*697 The substance of the price-gouging prohibition is found in subdivision (2) of General Business Law § 396-r: "During any abnormal disruption of the market for consumer goods and services vital and necessary for the health, safety and welfare of consumers, resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy * * * no merchant shall sell or offer to sell any such consumer goods or services for an amount which represents an unconscionably excessive price.” Consumer goods and services are defined as "those used, bought or rendered primarily for personal, family or household purposes”.
At the outset, we note that respondents’ argument that the statute is void for vagueness was not raised in their answer to the petition or in any other submission to the trial court. Accordingly, that argument is not preserved for our review (see, e.g., Matter of Barbara C., 64 NY2d 866).
Respondents also argue, however, as they did in the lower courts, that electric generators are not vital and necessary for the health, safety and welfare of consumers and, therefore, the price-gouging prohibition does not apply to the sales in question. We cannot agree. The affidavits in support of the petition illustrate that, for many consumers, electrical power is a necessity, not a mere convenience. For example, one consumer bought a generator from respondents to power a nebulizer to treat her 41A-year-old son who suffers from chronic asthma. Others suffered from health problems that made it difficult for them to venture out repeatedly to buy fresh food or ice. Electricity to power their refrigerators and freezers was necessary within the meaning of the statute.
Furthermore, the statute provides its own evidence that electricity is considered by the Legislature to be essential: "failure or shortage of electric power” is prominent among the calamities that trigger the price-gouging prohibition. If a power failure or shortage is the cause of a market disruption, the purchase of a generator is precisely the kind of transaction that the statute was designed to regulate. The situation is ripe for overreaching by the merchant, who enjoys a temporary imbalance in bargaining power by virtue of an abnormal level of demand, in terms of both the number of consumers who desire the item and the sense of urgency that increases that desire. We agree with the lower courts that these generator sales were within the reach df the statute.
Respondents also contend that the prices charged were not *698 unconscionably excessive. They note that, for some of the sales during the period, the sales price exceeded the base price by less than 5%; for others the differential fell between 5 and 15%. In fact, in the vast majority of the sales, the prices were inflated by less than 30%. In only five sales, according to the Attorney-General’s figures, did the disparity reach as high as 60%. Even if some of the prices can be considered unconscionably excessive, they claim, others are clearly not, and they should not be required to make restitution to all consumers who were charged more than the base price.
To support their argument, respondents point to General Business Law § 396-r (3), which provides in essence that evidence of a "gross disparity” between the sales price at the time of the market disruption and the price charged before the disruption is prima facie proof of price gouging.[2] From this provision and case law applying the unconscionability standard of the Uniform Commercial Code (UCC 2-302), respondents argue that the Legislature intended the price-gouging statute to apply only to extremely large price increases and that, accordingly, the majority of their sales did not offend the price-gouging prohibition.
Respondents’ argument places undue emphasis on the "gross disparity” language of subdivision (3), treating it as a definition of price gouging. But the provision is procedural rather than definitional; it simply establishes a means of providing presumptive evidence that the merchant has engaged in price gouging. A showing of a gross disparity in prices, coupled with proof that the disparity is not attributable to supplier costs, raises a presumption that the merchant used the leverage provided by the market disruption to extract a higher price. The use of such leverage is what defines price gouging, not some arbitrarily drawn line of excessiveness.
Furthermore, the term "unconscionably excessive” does not limit the statute’s prohibition to "extremely large price in *699 creases”, as respondents would have it. The doctrine of unconscionability, as developed in the common law of contracts and in the application of UCC 2-302, has both substantive and procedural aspects (see, e.g., Leff, Unconscionability and the Code — The Emperor’s New Clause, 115 U Pa L Rev 485; Eddy, On the "Essential” Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719 (2), 65 Cal L Rev 28, 42-50). Respondents’ argument focuses solely on the substantive aspect, which considers whether one or more contract terms are unreasonably favorable to one party (Industralease Automated & Scientific Equip. Corp. v R. M. E. Enters., 58 AD2d 482, 489, n 4; see, Jones v Star Credit Corp., 59 Misc 2d 189 [excessive price]; Henningsen v Bloomfield Motors, 32 NJ 358, 161 A2d 69 [disclaimer of warranty]; American Home Improvement v Maclver, 105 NH 435, 201 A2d 886 [excessive price]). The procedural aspect, on the other hand, looks to the contract formation process, with emphasis on such factors as inequality of bargaining power, the use of deceptive or high-pressure sales techniques, and confusing or hidden language in the written agreement (State of New York v Wolowitz, 96 AD2d 47, 67; see, Williams v Walker-Thomas Furniture Co., 350 F2d 445, 449). Thus, a price may be unconscionably excessive because, substantively, the amount of the excess is unconscionably extreme, or because, procedurally, the excess was obtained through unconscionable means, or because of a combination of both factors (see, State of New York v Wolowitz, 96 AD2d 47, 68, supra).
Here, the Attorney-General’s prima facie case established, at least presumptively, that respondents’ price increases were attributable solely to their use of the bargaining advantage created by the natural disaster — that is, through means that are " 'unconscionable according to the mores and business practices of the time and place’ ” (Mandel v Liebman, 303 NY 88, 96), because General Business Law § 396-r defines the mores governing this business setting and excises the use of such advantage from the repertoire of legitimate business practices. Furthermore, in this case, where the sales occurred over a relatively short period of time and were associated with a single market disruption, the presumption that the excess was unconscionably obtained, though established through proof of gross disparities, extends as well to the sales marked by lesser increases. The evidence, including the deposition testimony of two of respondents’ employees, makes the inference inescapable that all of the price increases were tainted *700 by respondents’ use of the superior bargaining position attributable to the power outage.
We do not mean to say that all price increases are prohibited during periods of abnormal market disruptions. The statute itself places the burden upon the Attorney-General to establish that the increases are not attributable to additional costs imposed by suppliers. And we agree with respondents that the merchant may avoid liability under the statute through proof that other costs explain the increases. But we also agree with the lower courts that respondents’ conclusory assertions in this regard were insufficient to raise a triable issue of fact, because they failed to demonstrate to what extent those costs justified the price increases.
Respondents claimed, for example, that their freight charges were three times higher than normal during the period in question, but they did not address whether the shipments were similar in size. Thus, they failed to explain how the increase aifected their cost per generator and gave the court no basis to evaluate their claim of cost justification. In short, respondents’ submissions, even if true, did not rebut the inference that the price increases were attributable to respondents’ use of the leverage provided by the market disruption and were therefore unconscionably excessive. Thus, the lower courts properly granted summary judgment in favor of the Attorney-General and ordered restitution to all consumers who paid in excess of the base price.
Finally, we reject respondents’ argument that a Receiver, rather than the Attorney-General, should administer the restitutionary fund and evaluate the consumer status of those who seek restitution. Although there may be instances where the appointment of a Receiver or a Referee would be warranted, the fashioning of a mechanism for the administration of a restitutionary fund is a matter appropriately left to the trial court’s discretion and there is no abuse of discretion in this instance.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. For most models, the base price identified by the Attorney-General was the price charged by respondents for sales immediately preceding the hurricane. These prices closely tracked the manufacturer’s suggested retail prices. Accordingly, if there were no recent sales of a particular model, the manufacturer’s suggested retail price was used as the base price.

. Subdivision 3 provides as follows: "Whether a price is unconscionably excessive is a question of law for the court. Evidence that * * * the amount charged represents a gross disparity between the price of the goods or services which were the subject of the transaction and their value measured by the price at which such consumer goods or services were sold or offered for sale by the merchant in the usual course of business immediately prior to the onset of the abnormal disruption of the market * * * and, in addition, that * * * the amount charged by the merchant was not attributable to additional costs imposed by its suppliers, shall constitute prima facie proof of a violation of this section”.